James K. Pirie *v.* Granite Savings Bank and Trust Co.

January Term, 1917.

Present: Munson, C. J., Watson, Haselton, Powers, and Taylor, JJ.

Opinion filed March 27, 1917.

*Oral Promise to Pay Debt of Another—When not within Statute of Frauds.*

An oral promise to pay another's debt out of the debtor's funds when they shall come into the hands of the promisor, in consideration of the creditor's agreement to refrain from suing upon the debt and trusteeing the funds before they are paid to the promisor, is not within the Statute of Frauds.

Special Assumpsit. Pleas, the general issue, and the Statute of Frauds. Trial by jury at the March Term, 1916, Washington County. *Butler,* J., presiding. Verdict for plaintiff. Defendant excepted. The opinion states the case.

*J. Ward Carver* and *William Wishart* for defendant.

*Richard A. Hoar* and *John W. Gordon* for plaintiff.

An oral promise to pay the debt of another is not within the Statute of Frauds, if it is based upon a valuable consideration, independent of the original debt, moving between the parties to the new promise or even from the original debtor to the promisor, and in such case it is immaterial whether or not the original debtor remains liable. *Cross* v. *Richardson,* 30 Vt. 641; *Templeton* v. *Bacon,* 33 Vt. 132.

The forbearance to bring suit is a sufficient consideration. *Smith* v. *Estate of Rogers,* 35 Vt. 140; *Fullam* v. *Adams,* 37 Vt. 391; *Lampson* v. *Hobart,* 28 Vt. 697; *Johnson* v. *Daniels,* 62 Vt. 417.

Munson, C. J. The only question is that presented by the defendant's motion for a directed verdict.

On the 22nd day of November, 1913, the Lowe-Mercer Com-

pany, a corporation engaged in the granite business, was owing the plaintiff an unsecured balance of $4,000 for granite purchased; and was also indebted to the defendant for a loan of $4,500 secured by a mortgage note held as collateral, and for other loans amounting to $5,525, as security for which the defendant held assignments of the company's contracts with persons for whom it was doing work. The company was also indebted to Nellie C. Lowe, a director in the company and the wife of C. E. Lowe, its president; to Zula Mercer, the wife of D. D. Mercer, the secretary and treasurer of the company; to Miss Lowe, a sister of the president; to the Consolidated Quarry Company, of which J. W. McDonald was treasurer; and to the Consolidated Lighting Company, and some others. There was a fire insurance of $22,000 on the property of the company, and an occupancy insurance of $6,000; the loss payable to the defendant as its interest might appear. The plant was destroyed by fire at the date above named. The company had executed to Miss Lowe a chattel mortgage for $1,500 on some of the personal property, of which the insurance companies had received no notice; and there was some uncertainty as to the payment of the loss. Soon after the fire Miss Lowe brought a suit on her claim and trusteed the insurance companies, and the defendant afterwards advanced $1,500 on the salvage and used it in paying this claim. On the 28th day of November, 1913, the Lowe-Mercer Company gave the defendant a writing directing it to reimburse itself for its loans from any insurance drafts that might be received, before giving the company credit for any balance; and soon after, by a further writing dated as above, it repeated this direction, and specifically assigned to the defendant all its interest in the occupancy insurance. On the 15th of December, 1913, the Lowe-Mercer Company gave the Consolidated Lighting Company an order on the defendant for $800, payable from the insurance money when collected, and this was accepted by the defendant on the 17th. On the first day of January, 1914, at the office of the Consolidated Quarry Company, Lowe and Mercer executed and delivered to the plaintiff the company's note for $4,000, dated the following day, and payable on demand at the defendant bank. On the third day of January the plaintiff left this note at the bank properly indorsed, in the hands of H. G. Woodruff, the defendant's treasurer, who received it for the defendant, and gave the plaintiff a card on

which it was entered as received for collection; and the note has since remained in the bank. The insurance claims were finally adjusted at $17,580.24; and $2,133.87 of this amount was paid to the bank in April, and applied on the $4,500 loan. The drafts for the balance were all in the hands of the bank on the 22nd day of May. With one exception they were made payable to the Lowe-Mercer Company, the defendant bank, Nellie C. Lowe, and Zula Mercer. In one, the name of S. Hollister Jackson, the company's attorney, was added. On the day named, Mrs. Lowe and Mrs. Mercer, and Lowe, Mercer and Jackson met at the bank, and the drafts were duly indorsed and credited to the Lowe-Mercer Company. Thereupon $3,000 was set aside to be held under an order of court not otherwise material here; the company's obligations to the bank were discharged; and treasurer's checks amounting to $4,462.86, which was the balance remaining, were issued as directed by Lowe and Mercer. Of these one was for $500, payable to Mr. Jackson; one for $1,021.13, payable to Mrs. Lowe; one for $1,380.28, payable to the Lowe-Mercer Company; and one for $1,436.14, payable to H. G. Woodruff, trustee. This last check was to cover orders given by the Lowe-Mercer Company and left at the bank. The insurance and the salvage were practically the only assets.

The plaintiff testified in substance that about the 20th of December, 1913, he had a talk with Mr. Woodruff about getting his pay; that he went to see if there was not some way to straighten out the chattel mortgage matter of Miss Lowe so that the bank and he could get their money; that the only way he could see to get his was to bring suit and trustee the insurance fund; that they made an agreement by which he was not to bring suit, but was to get his account put into a bank note and deposit it with the bank for collection, and they were to see to it, when the insurance money came in, that he got his pay after the bank got theirs; that a part of the talk was that the bank would take a chattel mortgage on the salvage and pay Miss Lowe's claim; that in pursuance of this talk he went to the Lowe-Mercer Company and got the note and took it to Mr. Woodruff and told him he had brought it according to the arrangement, and that Lowe and Mercer had agreed to it; that Lowe told him he had been to the bank and made the arrangement for his leaving the note there instead of taking it to his own bank for collection, and that Woodruff told him that Lowe had

been there, and that everything was satisfactory and he could leave the note there.

J. W. McDonald testified in substance that in consequence of directions received from the Lowe-Mercer Company, Pirie and he went to the bank and saw Mr. Woodruff; that Pirie told Woodruff he had this note and was instructed by the company to come there, and that he had made arrangements that the note was to be paid as soon as they received the insurance money, and that Woodruff told them that was agreed on between him and Lowe; that Pirie said if the bank wouldn't agree to this he should trustee, and that Woodruff said he would pay the note if he got money enough above their mortgage; that this conversation was had at the time Pirie left the note; that he had been there with Pirie on an occasion before this, and that they then had a talk with Woodruff to see if they couldn't make arrangements to pay off Miss Lowe, and that at the next interview Woodruff told them he had made arrangements and paid her off; that the conversation with Lowe and Mercer which led to their going to the bank started in relation to the trustee of Miss Lowe, and that Pirie told them that if she was going to attach the money he was going to do likewise; that Lowe said if Pirie wouldn't do this he would go to the bank and make arrangements to have the note put in there and paid when the insurance money came in; that soon after this Lowe told them he had seen Woodruff and made the arrangement; that on their reporting this to Woodruff he said they had arranged to have the notes come there and that as soon as the insurance came in they would pay them.

Mr. Woodruff testified that a few days prior to the date of the note he had a talk with Pirie, in which Pirie said he had some talk with the Lowe-Mercer Company about giving him a note; that Pirie asked if the bank would receive it for collection, and that witness told him that if he wanted to leave it there it would be all right; that there might have been some talk when the note was deposited there to the effect that the bank would take the note and collect it out of the insurance money when it came in—talk to the extent that they both knew there was insurance money coming in and that that was all the money that would be available for the payment of the note; that McDonald was present and heard the talk on both occasions; that witness never told Pirie that if he wouldn't trustee the insurance companies the bank would pay his note after its own claim was paid,

and never told him that the Lowe-Mercer Company had made arrangements with the bank to pay the note after receiving its own pay; that the Lowe-Mercer Company had not made any such arrangement with the bank.

Mr. Lowe testified that he never made any arrangement with the bank to pay the Pirie note, and never told Pirie that he had; that he never told Pirie that if he would take the note the bank would look after it; that he never told him that he had seen Woodruff and that it was all arranged, and that all he would have to do would be to leave the note there and he would get his pay when the insurance money came in; that he never had any such talk with Woodruff; that Pirie said he would rather have a note than an order on the bank, and that the reason he gave for wanting the note was that it would verify the amount; that he offered Pirie an order similar to the one he had given the Consolidated Lighting Company, which was the only order out at that time; that if he had given such an order as he offered to, he would have expected it to be treated the same as the other orders in due time.

Mercer testified that he was present at the time the note was given, and that Lowe did not in his presence tell Pirie that he had made an arrangement with the bank to pay it; that he himself had no such talk with Woodruff, and that the Lowe-Mercer Company never to his knowledge authorized the bank to pay it.

The plaintiff testified that he did not know of the receipt and disbursement of the insurance money at the time, and did not learn of it from Woodruff. Woodruff testified that he called the attention of the Lowe-Mercer Company to this note several times before the insurance money came in, and asked them what they were going to do about it, but made no other demand; that he did not notify Pirie that they had refused to pay the note until some time in the summer; that he did not inform Pirie that the money was going out without any of it being applied on his note, or that he was doing nothing to collect it.

There was evidence from which it might reasonably be inferred that fears were entertained regarding the payment of the insurance money, and that both the Lowe-Mercer Company and the defendant were anxious to obtain an adjustment of the loss without the risk or delay incident to litigation. There was evidence tending to show that the plaintiff was threatening to

sue the Lowe-Mercer Company and trustee the insurance companies, and that this was made the basis of a negotiation which resulted in the giving of the note. There was also evidence tending to show that the note was not left for collection in the ordinary course, but under some special agreement. It is not denied that Mr. Woodruff had authority to make such an agreement as is claimed. The evidence of the opposing sides upon the vital question is directly contradictory, but we find nothing in the case which can be held to deprive the testimony of the plaintiff and McDonald of a substantial evidentiary effect. So there was evidence tending to show that the plaintiff and defendant and the Lowe-Mercer Company came to an understanding that the plaintiff should refrain from bringing suit, and that his claim should be paid from the insurance money after the claims of the defendant were satisfied.

The defendant claims that its undertaking was void, because it was a promise to pay the debt of another if waited on for a certain time, leaving the debt to be enforced against the debtor during that time; citing *Russell* v. *Buck*, 11 Vt. 166. But the defendant's agreement was not an undertaking to pay the debt of the Lowe-Mercer Company on its own account. Its agreement was in effect an acceptance of an order of the Lowe-Mercer Company to pay the plaintiff's claim out of money of the company which was to come into the defendant's hands.

"A promise to pay another man's debt out of that other man's own funds, when they shall come to the hands of the person promising, is not within the Statute of Frauds." *Williams* v. *Little*, 35 Vt. 323; *Pocket* v. *Almon*, 90 Vt. 10, 96 Atl. 421.

According to the defendant's evidence there was no promise to pay. According to the plaintiff's evidence there was a promise to pay the amount of the note if enough money remained after paying the defendant's claims. Enough for a full payment remained, but the verdict is for a smaller sum; and the defendant says the jury has failed to find the contract testified to by the plaintiff. It is difficult to see how the recognition of the priority of the Lighting Company's order could be made available by the defendant to impeach the verdict; but it is enough to say that the matter is not within the field of inquiry covered by a motion for a directed verdict.

*Judgment affirmed.*